UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

ROSEANNE M. CURRIER                          CIVIL ACTION

v.                                           NO. 11-2208

ENTERGY SERVICES, INC., ET AL.               SECTION "F"

ORDER AND REASONS

Before the Court is defendant Steven Griffith's motion to dismiss for failure to state a claim as to him.  For the reasons that follow, the motion is GRANTED in part and DENIED in part.  The pleaded facts are extensive.

**Background**

This litigation arises out of a corporate jet pilot's claims that her employer, in retaliation for her stance on aviation safety, grounded her without good cause, launched a sham "independent" investigation into a decades-old minor injury, and after FAA-certified physicians once again gave her a clean bill of health, contrived a mental health issue that left her grounded permanently.

Entergy Services, Inc. hired the plaintiff, Roseanne Currier, as a corporate jet pilot on May 30, 2005.  She had started flying as a teenager, beginning her professional flying career in 1988 and became the youngest woman to be certified as a captain in the Gulfstream GIV.  Lauded in 2005 as "the most qualified pilot Entergy had hired in recent years," she excelled during her first

1

years with the company.   According to her annual performance reviews, Currier was "a role model and advocate for safe work practices" whose "expert skills" were "instrumental in making sure the 2006 hires achieved" their certifications in the Cessna Citation XLS aircraft.

Her supervisor retired in May of 2008 at a time when Currier served as the "model manager" for the Citation XLS, certifying junior pilots to serve as captains or first officers. In late 2008, Currier refused to sign off another pilot, Susan Kearns.  Currier believes that she was given a poor performance review for the following year on non-flight operation areas in retaliation for her refusal to sign off on Kearns.[1]  When Currier was denied a vacation day the friday after Thanksgiving in 2009, she lodged another complaint to the Entergy ethics hotline.  Entergy retained outside counsel, Steven Griffith, to conduct the   investigation into Currier's complaint; the conclusion of the investigation was that it was bad management.

After Entergy acquired two new Bombardier Challenger 300

---

[1]Currier reported Kearns' pilot skill deficiencies, as safety concerns. As a result, Entergy aviation management disciplined Currier and removed her from the role of model manager. After additional flights with Kearns, Currier also reported the safety concerns she had with Kearns' performance to the Entergy ethics hotline in December 2008.

Suggesting a motive for management to retaliate against her, Currier infers that it is a departmental goal "quite likely tied to the bonus compensation" of Entergy aviation management "that all pilots be certified during the year to serve as pilot in command on Entergy's aircraft.

aircrafts, in August 2010 Entergy sent Currier for initial training and certification on the Bombardier Challenger 300.  The training involved several exercises in an aircraft simulator.  It is suggested that the Bombardier Challenger 300 simulator is viewed within the industry as a difficult aircraft and not very accurate or responsive.  Currier's training was further complicated by her simulation partner, another Entergy pilot, who was not a supportive second-in-command pilot.  As a result, Currier became upset during one of the simulator runs, and she opted to end the session without completing all of the assigned simulated maneuvers, rather than attempting them again.  She requested an extra simulator run prior to her final check ride, which is a live flight in an actual aircraft.[2]  Currier completed the assigned maneuvers in the simulator before she successfully flew her check ride and became type certified in the Challenger 300.

After she returned from training, Currier flew five trips for Entergy; all were successfully completed.  Then, during her annual performance review, Mr. Shilstone decided that an old hand injury, which Currier had suffered in 1988 and since arguably had fully healed, was an operational issue.[3]  Entergy grounded her on

---

[2]She called the chief pilot at the time, Mr. Shilstone, to request the extra session, but he was unavailable.  When she informed him of the extra simulator run the following morning, he did not indicate that he had a problem with it.

[3]In 1988 Currier suffered a hand injury while working as a Lear Jet captain.  At the end of a charter flight she was removing

September 2, 2010.  The next day, she was assigned simple clerical work that she considered demeaning and degrading; this work continued until she was instructed to go home on paid leave on October 27, 2010.  Meanwhile, she was anxious to return to flight status.  (For the purposes of the pending motion, whether Currier was or was not a chronic complainer is of no moment).

Currier attempted to determine from Entergy Aviation Management what steps she needed to take to be restored to flight status.  No clear explanation was given, so she met with the Aviation Medical Examiner retained by Entergy to perform aviation medical exams on its New Orleans pilots, Dr. Felix Rabito.  As a result of his examination, Dr. Rabito reported, by letter dated September 13, 2010 to Mr. Shilstone that:

> My clinical impression is that this applicant has normal
> functional capacity involving her left hand with only
> residual paresthesia but adequate feeling [in] the left
> thumb.  It is expected that she would tend to favor this
> digit and repetitive strenuous motion with the left hand
> may aggravate her paresthesia symptoms....  At the
> present time her mild paresthesia in her left thumb do
> [sic] not constitute significant functional limitation or
> disability.  No changes in her work habits or lifestyle

---

items left in the cabin when she fell on the aircraft steps.
During the fall, a glass bottle she was carrying broke and cut
her left hand.  Currier went off flight status, received workers
compensation, and recovered after medical treatment.  She
received a renewed FAA medical certification, which included the
functionality of her hand, and she was restored to flight status.
The workers compensation record from New York notes that at the
end of her recovery period: "Case closed – no medical evidence of
permanency." In each subsequent FAA medical examination, Currier
checked the appropriate boxes on medical forms to indicate that
she had been hospitalized and had surgery before; some of the FAA
forms even include a short narrative about her hand injury.

appear indicated on the basis of these physical findings.

With still no information from Entergy about her flight status, Currier acted on her own, locating an out-of-state specialist on hand injury and function among FAA qualified first class medical examiners, Dr. Richard Hehmann.  On September 27, 2010, Dr. Hehmann examined Currier and issued her a new FAA first class medical certificate.  He also reported the results of his examination, including that her left hand and thumb "revealed no functional limitations", and he opined that "I do not believe this small area of decreased sensation on Capt. Currier's left thumb impacts her ability to pilot airplanes."

On September 30, 2010 Currier was again seen by Dr. Rabito. Currier took notes during the appointment. She wrote

> He cleared me to fly, indicated that he chastised John [Shilstone] in his conversation last time regarding my medical status.  He indicated that the process was less than on the up and up.  He indicated that his letter emphatically indicated that I had no functional limitations and was qualified to posses[s] a first class medical and operate aircraft.  He said he had spoken with [Shilstone] as he had called [him] regarding my appointment that morning.

Later that day, Currier spoke to Mr. Oliver Trowbridge, Entergy's Corporate Aviation Manager, who inquired about Currier's prior medical circumstances. Currier assured Trowbridge that if the FAA had a problem they would have issued a Pathology Index (PI) number visible in her FAA medical file, and there was not one. Currier told Trowbridge that she would follow up with him the

following week to provide more details.

Currier still had not been reinstated to flight status; she remained on administrative leave.  In spite of the information available to Mr. Trowbridge from both Dr. Hehmann and Dr. Rabito, both opining as to her physical fitness to fly, Mr. Trowbridge wrote to Dr. Salazar, the Southwest Regional Flight Surgeon for the FAA on October 6, 2010.  Mr. Trowbridge requested FAA intervention, assessment, and evaluation of Currier's hand and any impact it had on her fitness to fly.[4]

The next day, on October 7, Currier's attorney wrote to Mr. Wayne Leonard, CEO of Entergy, charging the company with an Americans with Disabilities Act violation, and requesting that Currier be restored to flight status.  To comply with Entergy's internal reporting policies, Currier lodged a more detailed complaint with the ethics hotline the next day about being grounded for the supposed hand issue.

Also on October 7, in response to Trowbridge's letter, the FAA mailed a letter to Currier's post office box requesting more information to establish that she was physically fit to fly. Currier had been assigned a PI number, which would serve as a reference number for future information, but also serves as a red flag to future employers, indicating that Currier had a medical

---

[4]Currier, who was not aware of the letter at the time, now suggests that Trowbridge made intentional misrepresentations in his letter to Dr. Salazar.  Again, the Court emphasizes these are contentions only.

issue that suggested an FAA investigation was proper. Currier
responded to this letter by having Dr. Hehmann send directly to the
FAA a report detailing his functional evaluation.

Steven Griffith, a New Orleans attorney, serves as outside
counsel for Entergy. Griffith was retained to conduct an
independent investigation into Currier's latest internal ethics
complaint. On October 21, and without her attorney present,
Griffith and Allan Smith, Entergy's in-house counsel, interviewed
Currier. But although the investigation was supposedly a response
to Currier's complaint that she was grounded due to her hand
injury, she charges that Griffith's questioning focused instead on
Currier's "emotionality" during her simulator run for the
Bombardier Challenger 300. She adds this was the first time that
anyone suggested that Currier's mental health, rather than her hand
injury, was a problem regarding her return to flight duty.
(Entergy, she pleads, had been assured by Drs. Rabito and Hehmann
that Currier's hand injury was not a valid reason to keep her
grounded). Again on October 27, Griffith and Smith questioned
Currier, without her attorney, which Currier believes was intended
to provoke an emotional outburst.

Griffith conducted interviews with others in the course of his
investigation, including Dr. Rabito, the Bombardier training
personnel, Currier's supervisors, and her co-workers. He completed
his report on November 5, 2010. The nine page document concluded

that Currier's claims of hostile work environment and
discrimination based on disability were without foundation.  He
wrote that Entergy continued to ground Currier because (1) there
was no FAA documentation that she was cleared to fly following her
1988 hand injury; (2) Currier had concealed her hand injury from
Entergy;[5] and (3) "issues related to Ms. Currier's emotional state
that were raised by Dr. Rabito."   Later in the same report,
Griffith expounds on the emotional issues that Dr. Rabito is said
to have raised:

> At this point, Ms. Currier has received physical
> clearance to fly related to her hand, and there are no
> remaining physical limitations on her ability to return
> to flight status. However, in her recent visit with Dr.
> Rabito, he concluded that she was emotionally labile, and
> he expressed that his expertise only permitted him to
> certify that Ms. Currier was *physically* able to fly.  Dr.
> Rabito expressly disavowed any determination that Ms.
> Currier was emotionally fit to fly at this time.
>
> (emphasis in original).

Dr. Rabito's notes reflect a conversation with Griffith on
October 21, 2010, prior to Griffith completing his report. As to
the content of the conversation, Dr. Rabito notes that there was
"no clinical abnormalities" of Currier's hand, that no new
information was provided, and that additional functional assessment
studies could be conducted, if needed.   Nowhere in his notes does

---

[5]Currier contends that she told her previous Entergy supervisor,
who had retired in 2008, about the old injury.  She also argues
that she attempted to conceal nothing, because her medical
records, while incomplete due to FAA file digitization, reflect
candor to the FAA about her injury.

Dr. Rabito record any issue with Currier's mental or emotional health.[6]

Meanwhile, on November 30, 2010 Dr. Salazar, the FAA Regional Flight Surgeon, wrote to Currier, notifying her that based on the information provided to him by her, including Dr. Hehmann's evaluation of her hand, she could retain the First Class Medical Certificate already in her possession.  Entergy then told Currier to attend recurrent training in Dallas, Texas for the Falcon 2000 classic corporate jet; she attended the training and passed the check ride without incident.

On December 10, 2010 Currier met with personnel in Entergy's Human Resources Department, who advised her that the internal investigation found no evidence of discrimination or retaliation to date, but that she would continue to be grounded because of emotional considerations pending a psychiatric examination.

FAA protocol for evaluating the mental fitness of pilots to fly involves a neuropsychologist and a forensic psychiatrist.  An in-house attorney for Entergy spoke with Dr. David Altman, the forensic psychiatrist who would be evaluating Captain Currier, and told him that the evaluation was the result of a physician's (presumably Dr. Rabito's) concerns about her emotional condition. Entergy, as a proxy for a doctor's referral note, shared Griffith's

---

[6]In all, Currier devotes 17 pages of her Complaint to refuting specific conclusions of fact contained in Griffith's report; none of which the Court comments on in this Rule 12(b)(6) motion.

entire nine page report to Dr. Altman before Currier's meeting with him.  Currier went to Chicago twice for her evaluations with Dr. Altman and her evaluating neuropsychologist.  Dr. Altman notified Currier during the clinical evaluation that she had failed the "CogScreen" portion of her neuropsychological examination.[7]  In the words of Dr. Altman, this test is "the business of balancing."  Dr. Altman suggested that a number of stressors, including her situation with Entergy, may have contributed to her failing performance.

As a result of her failing evaluation, Currier was forced to forgo paid leave in favor of short term (and, ultimately, long term) disability benefits.[8]  Though Dr. Altman assured Currier that therapy could remediate her problems, Currier, for whatever reasons, was unable to complete her course of therapy and continues to receive long term disability benefits.  After her failed evaluations, Currier submitted a Charge of Discrimination with the Equal Employment Opportunity Commission for, among others, discrimination based on retaliation, sex, and perceived disability. The EEOC issued her a right to sue letter in August 2011 that

_____

[7]The CogScreen is designed to evaluate certain cognitive functions in pilots, including areas like math computation, visual scanning, systematic application of a novel organizing principle, working memory, etc.

[8]Similarly situated male pilots were not required to take disability leave while completing diagnosis and treatment for conditions with an effect on their flight status, Currier contends.

culminated in this lawsuit.

On September 2, 2011 Currier sued Entergy and Trowbridge, later adding Griffith as a defendant.  The case was originally assigned to Section L of this Court; the defendants filed Rule 12(b)(6) motions to dismiss.[9]  On September 30, 2013, Judge Morgan granted in part, without prejudice, motions to dismiss Entergy and Trowbridge,[10] and the Court granted without prejudice Griffith's motion to dismiss.[11]  Currier filed her second supplemental and amended complaint in October 2013.  Her claims against Entergy include abuse of right, ADA claims for harassment and discrimination based on perceived disability, Title VII claims for sex discrimination and retaliation, intentional infliction of

---

[9]Entergy and Trowbridge and, separately, Griffith, filed Rule 12(b)(6) motions to dismiss in early 2012.  While those motions were pending, Currier requested leave to file a second supplemental and amended complaint.  On April 4, 2012, while the three motions were pending, the case was reassigned to Judge Morgan in Section E of this Court.  Meanwhile, on April 27, 2012 Magistrate Judge Shushan denied without prejudice the plaintiff's motion for leave to file second amended complaint on the ground that the defendants would be prejudiced because they would have to re-file motions to dismiss that were already pending.

[10]See Order and Reasons dated September 30, 2013, Rec. Doc. 51 (Morgan, J.)(denying Entergy defendants' motion with respect to Currier's intentional infliction of emotional distress, fraud, and abuse of right claims; and granting the motion with respect to Currier's employment discrimination and retaliation claim, but allowing her to re-plead).

[11]See Order and Reasons dated September 30, 2013, Rec. Doc. 52 (Morgan, J.)(granting without prejudice Griffith's motion to dismiss Currier's abuse of right and intentional infliction of emotional distress claims, allowing Currier to file an amended complaint)

emotional distress, and civil conspiracy. Currier asserts the following claims against Griffith: intentional infliction of emotional distress, fraud or intentional misrepresentation, negligent misrepresentation, invasion of privacy, and civil conspiracy. Griffith now seeks dismissal of each of the plaintiff's claims.[12]

## I. Pleading Standards
### *A.*

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a party to move for dismissal of a complaint for failure to state a claim upon which relief can be granted. Such a motion is rarely granted because it is viewed with disfavor. See Lowrey v. Tex. A & M Univ. Sys., 117 F.3d 242, 247 (5th Cir. 1997) (quoting Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1050 (5th Cir. 1982)).

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009)(citing Fed.R.Civ.P. 8). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. at 678 (citing

_____

[12]Griffith's motion was noticed for submission before Judge Morgan on December 4, 2013; when she issued an order of recusal, the matter was re-allotted to this Court and the Court continued the submission date to March 12, 2014.

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

In considering a Rule 12(b)(6) motion, the Court "accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'"   See Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit, 369 F.3d 464 (5th Cir. 2004) (quoting Jones v. Greninger, 188 F.3d 322, 324 (5th Cir. 1999)).   But, in deciding whether dismissal is warranted, the Court will not accept conclusory allegations in the complaint as true.   Kaiser, 677 F.2d at 1050.   Indeed, the Court must first identify allegations that are conclusory and, thus, not entitled to the assumption of truth. Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009). A corollary: legal conclusions "must be supported by factual allegations."   Id. at 678.   Assuming the veracity of the well-pleaded factual allegations, the Court must then determine "whether they plausibly give rise to an entitlement to relief." Id. at 679.

"'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Gonzalez v. Kay, 577 F.3d 600, 603 (5th Cir. 2009)(quoting Iqbal, 556 U.S. at 678)(internal quotation marks omitted).   "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations and footnote omitted).   "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."). This is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. at 678 (internal quotations omitted) (citing Twombly, 550 U.S. at 557). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'", thus, "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (alteration in original) (citation omitted).

Finally, "[w]hen reviewing a motion to dismiss, a district court 'must consider the complaint in its entirety, as well as other sources ordinarily examined when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Funk v. Stryker Corp., 631 F.3d 777, 783 (5th Cir. 2011)(quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)).

14

*B.*

Rule 9(b) of the Federal Rules of Civil Procedure imposes a "heightened pleading standard", and provides that when alleging fraud "a party must state with particularity the circumstances constituting fraud or mistake...  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b).  "Rule 9(b) is an exception to Rule 8(a)'s simplified pleading that calls for a 'short and plain statement of the claim.'" U.S. ex rel. Grubbs v. Kannegati, 565 F.3d 180, 185 (5th Cir. 2009).  "The particularity demanded by Rule 9(b)", the Fifth Circuit instructs, "is supplemental to the Supreme Court's...interpretation of Rule 8(a) requiring 'enough facts [taken as true] to state a claim to relief that is plausible on its face.'" Id. (citing Twombly, 550 U.S. at 570).

To satisfy Rule 9(b), a plaintiff must (1) specify the statements alleged to be fraudulent, (2) identify the speaker or author of the statements, (3) state when and where the statements were made, and (4) state why the statements were fraudulent. Hermann Holdings Ltd. v. Lucent Technologies, Inc., 302 F.3d 552, 564-65 (5th Cir. 2002)(citations omitted).  The Fifth Circuit commands that Rule 9(b) be interpreted strictly (id.), but instructs courts to be mindful that "Rule 9(b) supplements but does not supplant Rule 8(a)'s notice pleading[;]  Rule 9(b) does not 'reflect a subscription to fact pleading' and requires only

15

'simple, concise, and direct' allegations of the 'circumstances constituting fraud,' which after <u>Twombly</u> must make relief plausible, not merely conceivable, when taken as true." <u>Kanneganti</u>, 565 F.3d at 185-86. Finally, the Court must realistically observe that "Rule 9(b)'s ultimate meaning is context-specific, and thus there is no single construction of Rule 9(b) that applies in all contexts." <u>Id.</u> at 188.

## II. Discussion

Griffith seeks dismissal of Currier's claims against him: intentional infliction of emotional distress (IIED), fraud or intentional misrepresentation, negligent misrepresentation, and invasion of privacy.[13] Griffith also seeks dismissal of the plaintiff's theory of solidary liability with his co-defendants based on civil conspiracy. The Court finds that the plaintiff has failed to plead facts that plausibly give rise to a claim for relief against Griffith with respect to IIED, fraud, and invasion of privacy, but cannot find as a matter of law that the plaintiff's allegations respecting civil conspiracy are technically insufficient.

*A. Intentional Infliction of Emotional Distress*

Griffith contends that for a second time, Currier has failed to sufficiently allege the intent to inflict emotional distress and

---

[13]The plaintiff concedes that dismissal of her negligent misrepresentation claim is appropriate and, therefore, Griffith's request as to that claim will be granted as unopposed.

that his alleged conduct does not rise to the level necessary to properly state an IIED claim under Louisiana law. On both counts, the Court agrees.

To recover on an IIED claim in Louisiana, a plaintiff is required to show that (1) the defendant's conduct was extreme and outrageous; (2) the plaintiff suffered severe emotional distress; and (3)"the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct." White v. Monsanto Co., 585 So. 2d 1205, 1209 (La. 1991). An IIED claim is not proper when the wrongdoer intends to commit another intentional tort, invasion of privacy for example, but incidentally causes some degree of emotional distress. See Restatement (Second) of Torts § 47 (1965); White, 585 So. 2d at 1209 (adopting an IIED cause of action in Louisiana "generally in accord with the legal precepts set forth in the Restatement texts and comments."). The conduct requirement in an IIED claim is difficult for a plaintiff to meet; the standard does not reach "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities," but, rather, the behavior must "go beyond all possible bounds of decency, [and must] be regarded as atrocious and utterly intolerable in a civilized community." Id.; see also Iturralde v. Shaw Grp., Inc., 512 F.App'x 430, 435 (5th Cir. 2013) ("Under Louisiana Civil Code Article 2315, plaintiffs must meet a high burden of proof to

prevail on an IIED claim."). In this case, on Rule 12(b)(6), Currier must allege facts that plausibly suggest that Griffith intended to cause her emotional distress, not merely that he intended to commit some wrongful act. She must also allege facts that plausibly suggest that his conduct was sufficiently extreme and outrageous so as to meet the high bar required by Louisiana law. She has not done so.

The Court has considered this claim before. In her original amended complaint, Currier also asserted an IIED claim against both Griffith and Entergy. The claim survived as to Entergy but, in dismissing the claim against Griffith, Judge Morgan noted that as to intent, Currier failed "to allege facts that would make it plausible to believe Griffith desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct." Currier v. Entergy Servs., Inc., No. 11-2208, 2013 WL 5506122 at *2 (E.D. La. Sept. 30, 2013). Regarding conduct, the Court observed that "it is highly unlikely the allegation that Griffith conducted aggressive ex parte questioning could satisfy the standard of extreme and outrageous conduct." Id. at *3. This continues to ring true when considering the plaintiff's conclusory allegations that Griffith aggressively questioned her. But Currier points out that in the current iteration of her complaint she alleges some additional conduct on the part of Griffith. Currier argues that the actions alleged in support of her new invasion of privacy and fraud claims

18

also speak to her IIED claim.

The Court finds that the facts alleged in Currier's second amended complaint still fall well below the requirements necessary to state an IIED claim against Griffith as an individual. The plaintiff urges that intent can be inferred from the surrounding circumstances: the allegedly voluminous misrepresentations in Griffith's report, his supposedly aggressive interrogation style,[14] and his alleged invasion of her privacy. But these circumstances are insufficient to support an inference that Griffith intended <u>to inflict emotional distress</u>, rather than the other intentional torts alleged. As to the conduct requirement, the allegations concerning Griffith's personal conduct, even with the additional allegations of invasion of privacy and the detailed disagreement with the findings from his report, simply fail to satisfy the remarkable pleading standard Louisiana law requires for an IIED claim. Because Currier has twice now failed to plead sufficient facts related to both intent and to conduct, dismissal of this claim is warranted.

----

[14]The complaint goes only so far as to use the word "aggressive" when describing Griffith's interrogation style without providing any more specific factual support. While the Court expresses doubt that an attorney's intense interrogation style should form the bedrock factual allegation of conduct sufficient to sustain an IIED claim, the Court cannot simply assume based on the word "aggressive" that Griffith's manner of questioning rose to the atrocious and intolerable level necessary under the law.

B. *Fraud/Intentional Misrepresentation*[15]

Griffith also urges the Court to dismiss Currier's allegations of delictual fraud. Specifically, Griffith argues that, even if his report contained what Currier characterizes as misrepresentations, she has failed to plead facts sufficient to suggest that he acted with fraudulent intent. Griffith adds that Currier fails to plead facts that she relied upon any representation made by Griffith, and that she cannot base her claim on anyone else's reliance on those representations. The Court finds that the plaintiff's allegations concerning the reliance element are lacking, and therefore, does not reach the sufficiency of the allegations as to intent for Rule 12(b)(6) purposes.

To succeed on a Louisiana tort claim for fraud, a plaintiff must show (1) a misrepresentation of a material fact, (2) made with the intent to deceive, and (3) causing justifiable reliance with resulting injury. Guidry v. U.S. Tobacco Co., Inc., 188 F.3d 619, 627 (5th Cir. 1999). While the requirements of material misrepresentation and fraudulent intent are in dispute, the parties devote much of their briefing to the issue of reliance.

On that issue, Currier urges the Court to find that she was forced to rely on Griffith's report by virtue of Entergy's complaint policy. She also urges the Court to recognize a cause of

---

[15] While the parties designate this claim as intentional misrepresentation and fraud, the two names refer to one cause of action. Guidry v. U.S. Tobacco Co., Inc., 188 F.3d 619, 627 (5th Cir. 1999). As such, the Court addresses these claims together.

20

action in Louisiana for harm caused to the plaintiff by a third party's reliance on Griffith's misrepresentations.

Currier alleges that she relied on the Griffith report because she initiated numerous ethics complaints with Entergy, and it was company policy to hire outside counsel to conduct investigations to resolve her complaints. She pleads that reliance on the truth of the report caused her harm, because had she known that the report would be untruthful, she would have left the company rather than attempting to resolve her disputes with management. Currier also submits that her evaluating psychiatrist relied on the contents of the Griffith report. (Entergy transmitted the report to the physician prior to Currier's psychiatric evaluation.) Currier believes that "had the Griffith report contained the truth," Entergy would have had no choice but to "view her claims differently." The plaintiff refers to this as "improper or misguided decision making by Entergy." To this point, she argues that Louisiana law recognizes a fraud claim based upon the reliance of third parties. She describes this construct as "triangular fraud," which occurs when one makes misrepresentations to another, and the actions of the second party in reliance on those misrepresentations cause harm to a third party, like Currier. To support this position, the plaintiff invokes Systems Engineering & Security, Inc. v. Science and Engineering Associates, Inc., 2006-0974 (La. App. 4 Cir. 6/20/07), 962 So. 2d 1089. In that case, the

defendant falsely represented to the General Services Administration (GSA) that it was a small business, and as a result the defendant was allowed to successfully bid on a government contract open only to small businesses. <u>Id</u>. at p. 3, 962 So. 2d at 1091. The plaintiff was a bona fide small business that submitted the only other bid on the contract. <u>Id</u>. The plaintiff sued on a theory of fraud, claiming that GSA relied on the misrepresentation causing the plaintiff harm. <u>Id</u>. The Louisiana Fourth Circuit Court of Appeal allowed the claim to proceed over the motion to dismiss, reasoning that both the plaintiff and GSA relied on the misrepresentations. <u>Id</u>. In another case, the Louisiana Third Circuit Court of Appeal allowed a claim to proceed when a car buyer sued her dealership claiming, in addition to several other incidents of fraud, that the dealership's misrepresentations to a financial institution about her income allowed her to borrow more than she could realistically afford. <u>LeJeune v. Paramount Nissan, LLC</u>, 2011-1151, p.4 (La. App. 3 Cir. 6/20/12), 102 So. 3d 203, 208.[16] Currier urges that because here, both Entergy and her evaluating psychiatrist relied on the misrepresentations from the Griffith report, her claim should be allowed to proceed.

For his part, Griffith claims that his report was for internal

_____

[16]The plaintiff invokes two other cases, but neither applies to this situation. One concerns negligent misrepresentation, <u>In re Propulsid Products Liability Litigation</u>, MDL 1355, 2002 WL 1446714 (E.D. La. July 2, 2002), and the other deals with first person reliance. <u>Gulf Prof. Co., Inc. v. Hoover Oilfield Supply, Inc.</u>, 672 F. Supp. 2d 752 (E.D. La. 2009).

use only, and that Currier could not have relied upon the report's representations, because she did not have access to the report until _after_ litigation commenced. He also maintains that Currier cannot base her claim for fraud on the reliance of Entergy or her evaluating psychiatrist, because Louisiana law does not recognize recovery based on a theory of "triangular fraud." He correctly distinguishes the Systems Engineering & Security case because the Louisiana Fourth Circuit Court of Appeal also recognized that the plaintiff company had itself relied on the defendant's misrepresentation, albeit without expounding on the nature of that reliance. See Systems Eng. & Sec., Inc. v. Science and Eng. Assoc., Inc., 2006-0974, p. 3 (La. App. 4 Cir. 6/20/07), 962 So. 2d 1089, 1091 ("It is further alleged that [the defendant's] false representations were relied upon by both the GSA and [plaintiff].").

Currier shifts the focus to her singular reliance but she cannot maintain her fraud claim based upon her own reliance on Griffith's alleged misrepresentations; her factual allegations are too conclusory to support a claim against Griffith. There are no factual allegations that Currier ever herself believed Griffith's findings to be true, or changed her position in response to such belief. Her fraud claim thus fails insofar as it is predicated on her own reliance.

The Court need not determine whether, as a matter of law, the

23

plaintiff may avail herself of the triangular fraud theory because, even if such a claim were viable under Louisiana law, Currier has failed to allege the reliance necessary to sustain it.[17] Reliance on the truth of a misrepresentation is inherent in the requirement of justifiable reliance in an action for fraud; in both a literal and doctrinal sense, one who does not believe the statements of the alleged tortfeasor has not been defrauded.   See Restatement (Second) of Torts § 541 (1977)("The recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him."). The allegations in the second amended complaint militate against Entergy having relied on the factual assertions contained in the Griffith report. In fact, only one allegation can arguably be read to relate Currier's conclusory suggestion that Entergy relied upon the truth of Griffith's alleged misrepresentations:

> Entergy, by its later use of the Griffith Report with Dr. Altman, clearly relied upon the Griffith report to make decisions regarding Capt. Currier's allegations. This resulted to damage to Capt. Currier in that her claims likely would have been viewed differently and a different outcome obtained with Entergy as a corporate employer had the Griffith Report contained the truth when decisions were made concerning her purported need for a mental examination, her employment, and any compensation that

---

[17]The Court expresses doubt as to the existence of triangular fraud in Louisiana. See Schaumburg  v. State Farm Mut. Auto Ins. Co., 421 F. App'x 434, 442 (5th Cir. 2011) ("Louisiana jurisprudence indicates that the following are the elements of the tort of fraud…3. reasonable or justifiable reliance *by the plaintiff*…") (citing Wooley v. Lucksinger, 2006-1140, pp. 378-379 (La. App. 1 Cir. 12/30/08), 14 So. 3d 311, 556 (emphasis added)).

might be due her for the actions of aviation management. However, the balance of Currier's allegations plead the exact opposite. Consider as an example:

> The effect [of Griffith's report] was to provide Entergy with grounds for both denying Capt. Currier's claims internally and for justifying the desired mental health examination…. The Griffith Report was timely transmitted to Entergy and then subject to use by Entergy for its own ill purposes.

While the Federal Rules of Civil Procedure contemplate inconsistent claims,[18] Currier's allegation that Entergy relied on the truth of Griffith's report is at bottom contrary to the facts pleaded to support the allegations that Entergy used the report as a mere tool in its retaliatory crusade to keep Currier grounded.

Because Currier has failed to allege sufficient facts supporting the justifiable reliance element of her fraud claim against Griffith, dismissal of the claim is appropriate. Additionally, because Currier has made clear that she does not intend to pursue her negligent misrepresentation claim against Griffith, his request to dismiss that claim as unopposed is granted.

*C. Invasion of Privacy*

Griffith seeks dismissal of the plaintiff's claim for invasion of privacy because, he argues, Currier's spare assertion that Griffith acquired her medical records from Dr. Rabito without

---

[18] See FED. R. CIV. P. 8(d)(3).

25

authorization does not suffice to satisfy her pleading burden.  He also argues that she has failed to plead either a privacy interest or damages.   The Court finds that Currier has not pleaded an actionable invasion of privacy under Louisiana law. Dismissal of this claim against Griffith is appropriate.

Louisiana law recognizes four genres of invasion of privacy claims: (1) appropriation of an individual's name or likeness; (2) unreasonable intrusion into physical solitude or seclusion; (3) "giving publicity which unreasonably places a person in a false light before the public;" and (4) unreasonable public disclosure of embarrassing private facts. Tate v. Woman's Hosp. Found., 2010-0425, p.4 (La. 1/19/11), 56 So. 3d 194, 197; Jaubert v. Crowley Post-Signal, Inc., 375 So. 2d 1386, 1389 (La. 1979). Only the second is at issue in this case.  Invasions of privacy may or may not be actionable, depending on the seriousness of the offender's conduct and the relative strength of the plaintiff's privacy interest. Jaubert, 375 So. at 1389. "Where a defendant's action is properly authorized or justified by circumstance, it may be found reasonable and nonactionable even through it amounts to a slight invasion of the plaintiff's privacy." Parish Nat. Bank v. Lane, 397 So. 2d 1282, 1286 (La. 1981).  A court balances the competing interests of the defendant, whose actions allegedly invaded the plaintiff's privacy, with those of the plaintiff to determine whether the invasion was unreasonable, and therefore actionable. Jaubert, 375 So. 2d at 1389.  In this case, the Court finds that

Griffith, acting under Entergy's instructions as counsel to conduct an investigation of an employment related matter that related to the employee's medical history or condition(s), was not actionably unreasonable in inquiring about Currier's medical records, especially given the allegations against Griffith.

Currier pleads merely that Griffith, along with Currier's direct supervisor and the head of Entergy's aviation department, invaded her privacy by acquiring "both written and verbal release of information" from Dr. Rabito. While Griffith's report indicates that Dr. Rabito verbally reported to him that Currier was emotionally unstable, Currier denies that Dr. Rabito ever made such a statement. As stated in the complaint, "The final paragraph [of Griffith's report], to the effect that Dr. Rabito opined that Capt. Currier was so emotionally labile that a mental examination was in order is simply false." Accepting the plaintiff's assertion that Dr. Rabito never made such a statement as fact, it becomes clear that Griffith alone perpetrated no actionable invasion of privacy. Currier indicates in her complaint that she consulted Dr. Rabito about her hand injury pursuant to direction from Entergy and that Dr. Rabito sent a letter to Entergy detailing his findings. Entergy engaged Griffith to investigate Currier's claim and her injury; he had an undisputed professional interest in completing the investigation. A telephone call from Griffith to Dr. Rabito regarding Currier's hand injury made in October, during the course

27

of Griffith's investigation, is not so unreasonable as a matter of law, without more, as to give rise to a claim in tort in Louisiana. This is especially true given that it is also beyond dispute that Currier obtained these medical opinions with the intention of sharing them with Entergy and its internal investigator so that she would be reinstated to flight status. Currier's claim for invasion of privacy against Griffith individually fails as a matter of Louisiana law.

*D. Civil Conspiracy / Solidary Liability*

Finally, Griffith seeks dismissal of Currier's liability theory predicated on civil conspiracy. According to Griffith,

> It is not enough for Ms. Currier to make a conclusory allegation of an agreement (which she does not even do) or even parallel conduct among parties and a "bare assertion" of civil conspiracy (the only thing she does do).

In her second amended complaint, Currier alleges that Griffith conspired with Entergy to commit intentional torts, naming as examples abuse of right, IIED, and fraud.[19] Additionally, Currier alleges that Griffith acted as either an employee or an agent of Entergy when committing the intentional torts of invasion of privacy and abuse of right, and she alleges that Griffith's conduct or knowledge can be imputed to Entergy because of their representational relationship.

_____

[19]At another point in her complaint, Currier alleges that Griffith is solidarily liable with Entergy and Trowbridge for "all of the intentional torts set forth herein."

28

Louisiana does not recognize a distinct cause of action for civil conspiracy, but "[h]e who conspires with another person to commit an intentional and willful act is answerable, in solido, with that person for the damage caused by that act." La. Civ. Code Ann. art. 2324 (2008). The actionable element of a civil conspiracy is the underlying intentional tort committed pursuant to an agreement between the wrongdoers. Able Sec. and Patrol, LLC v. State of Louisiana, 569 F. Supp. 2d 617, 636 (E.D.La. 2008). In Louisiana, a conspiracy may be proven by circumstantial evidence, as "conspirators rarely formulate their plans in ways susceptible of proof by direct evidence." Silver v. Nelson, 610 F. Supp. 505, 517 (E.D. La. 1985)(quoting Thomas v. City of New Orleans, 687 F.2d 80, 83 (5th Cir. 1982)). A plaintiff must show an unlawful act and assistance or encouragement that amounts to a conspiracy to commit the underlying tort. Chrysler Credit Corp. v. Whitney Nat'l Bank, 51 F.3d 553, 557 (5th Cir. 1995). In related contexts, courts have held that employees or agents are legally incapable of conspiring with their employers or principals because in many cases the law considers principals and their agents to be single entities incapable of conspiring with each other. See Rhyce v. Martin, 173 F. Supp. 2d 521, 532-533, 536 (E.D. La. 2001)(Clement, J.)(discussing the single entity theory in the context of 42 U.S.C. § 1985, 42 U.S.C. § 1986, and Sherman Antitrust claims). The question of whether or not agents and related principals may

conspire with each other to create solidary liability under Louisiana Civil Code article 2324 remains unsettled.  Id. at 536.[20]

Currier advances at least eight factual allegations that can be read to support her civil conspiracy theory: (1) Griffith and Entergy's in-house counsel conducted interviews with the plaintiff without her counsel;[21] (2) during these meetings, Griffith acted aggressively, in a manner intended to elicit an emotional response that could be used as an excuse to inquire into Currier's mental health; (3) according to Griffith's own report, Entergy's in-house counsel was closely involved in the entire internal investigation; (4) Griffith's report contained some of the same misrepresentations that appeared in the Entergy letter to the FAA asking for their assistance in investigating Currier's physical injury; (5) Griffith's report contained many intentional misrepresentations that Entergy then used to justify grounding the plaintiff; (6) Griffith and Entergy employees obtained Currier's medical records and possibly solicited opinions about her mental health by speaking with Dr. Rabito even after he sent a letter of findings clearing

---

[20]While the law on solidary liability for employees and employers through conspiracy is unsettled, Louisiana law allows such relationships to create joint liability for the intentional torts of employees or supervisors when the underlying delictual acts are closely connected in time, place, and causation to the duties of the employment.  LeBrane v. Lewis, 292 So. 2d 216, 218-219 (La. 1974); La. Civ. Code Ann. art. 2320 (2008).

[21]The Court notes that if Currier had counsel and Griffith knew or should have known, his encounters of Currier without the presence of her counsel is a serious allegation.

her for flight duty; (7) Griffith's report does not seriously
address the substance of Currier's ethics complaint, but focuses
almost entirely on her own character; and (8) Entergy used the
Griffith report to prejudice the evaluating psychiatrist as to
Currier's mental state.

Of course Currier has not proven that any conspiracy between
Griffith and Entergy existed,[22] and the Court expresses no opinion
as to the viability of the plaintiff's conspiracy theory as this
litigation progresses.  And, the parties' papers have not assisted
the Court such that it might find as a matter of law whether
Griffith acting as Entergy's agent is legally capable of conspiring
with Entergy under the Louisiana Civil Code.  But, just as the
plaintiff cannot rest on conclusory allegations unsupported by
facts, the defendant cannot, as he has done, merely suggest that
"the allegations do not add up to conspiracy to commit intentional
torts designed to harm Ms. Currier."  In light of the unsettled
Louisiana law on the issue, the volume of purported factual
allegations in the complaint and exhibits,[23] and the generality with
which the defendant approached dismissal of this particular theory
of liability, the Court cannot determine as a matter of law that
the plaintiff has failed to allege facts sufficient to sustain her

_____

[22]She need not do so at this early stage.

[23]The second amended complaint is 79 pages with some 41 exhibits;
the pleading submission totaling almost 400 pages.

31

theory of solidary liability based on civil conspiracy.

### III. Conclusion

For all these reasons, the defendant's motion to dismiss is GRANTED in part with respect to Currier's claims against him for intentional infliction of emotional distress, fraud, negligent misrepresentation, and invasion of privacy; and the defendant's motion is DENIED in part with respect to the plaintiff's civil conspiracy theory of recovery.[24]

New Orleans, Louisiana, March 14, 2014

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

[24] Finally, the Court feels obligated to remind all counsel of the mandate of 28 U.S.C. § 1927.